IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–00882–EWN

BEN BORROEL,

      Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner
of Social Security Administration,

      Defendant.

_____

**ORDER AND MEMORANDUM OF DECISION**
_____

      This is a social security benefits appeal.  Plaintiff Ben Borroel challenges the final decision

of the Commissioner of Social Security (the "Commissioner"), denying his application for

disability insurance benefits.[1]  Jurisdiction is premised upon 42 U.S.C.A. § 405(g) (West 2007).

## FACTS

### 1.   *Medical Evidence Before the ALJ*

      Plaintiff was born on September 11, 1958, and was forty-six years old at the onset of his

alleged disability.  (Admin. R. at 78 [hereinafter "Admin. R."] [filed Jul. 25, 2006].)  Plaintiff

completed high school and attended one year of college.  (*Id.* at 119.)  He worked in the

_____

    [1]Although the caption of this case reflects the Commissioner to be Jo Anne B. Barnhart, a
new Commissioner, Michael J. Astrue, has been confirmed.

vocationally relevant past as a bellringer, customer service representative, stocker, bagger, cook, and fast food worker.  (*Id*. at 120–21.)  When Plaintiff initially filed for disability, he alleged an onset date of March 1, 1998, due to epileptic seizures.  (*Id*. at 78, 113.)  He later amended his onset date to July 12, 2003.  (*Id*. at 256.)

The record indicates that Plaintiff has a history of treatment for epileptic seizures since childhood.  (*See id*. at 192, 214.)  Prior to his onset date, Plaintiff was also diagnosed with diabetes mellitus.  (*Id*. at 210.)  In June of 1999, Plaintiff fell during a seizure and had to undergo surgery to repair his broken left leg.  (*Id*. at 155.)  On May 2, 2003, Plaintiff was admitted to a hospital in Colorado Springs, Colorado for treatment of a right ankle fracture also incurred when he fell during a seizure.  (*Id*. at 187–206.)  That day, he underwent ankle surgery.  (*Id*.)  On May 4, 2003, he was discharged in "stable" condition with a prescription for narcotic pain killers, as well as direction to undergo physical therapy.  (*Id*. at 187.)

In May of 2003, Plaintiff relocated to his mother's home in Grand Junction, Colorado, so that she could care for him.  (*Id*. at 236.)  There, Plaintiff began seeing Larry Copeland, D.O. as a treating physician.  (*Id*.)  On May 22, 2003, Plaintiff saw Dr. Copeland for a follow-up to his ankle surgery.  (*Id*. at 236–37.)  Plaintiff reported that his ankle was "not too painful with pain medication," the swelling had decreased, and he was able to ambulate with a walker.  (*Id*.)  Dr. Copeland noted that Plaintiff had a gran mal seizure[2] on May 1, 2003 leading to the ankle injury.

---

[2]A gran mal, or tonic-clonic, seizure is a seizure marked by tonic (sustained) and/or clonic (intermittent) muscular contractions.  J.E. SCHMIDT, M.D., 6–T ATTORNEYS' DICTIONARY OF MEDICINE 1797, 1801 (Matthew Bender 2005).

(*Id.*)  Physical examination showed the ankle surgery site was clean, dry, intact, and had no sign

of infection.  (*Id.* at 237.)  On June 19, 2003, Plaintiff returned to Dr. Copeland and complained

that his ankle was sore.  (*Id.* at 235.)  Dr. Copeland found Plaintiff had a rash under the entire

area of his cast as well as venous insufficiency.  (*Id.*)  X-rays showed Plaintiff's ankle was

"holding."  (*Id.*)  On June 23, 2003, Plaintiff saw Dr. Copeland's nurse, Stacey Dalpiaz, R.N.  for

a wound assessment and dressing change on his ankle.  (*Id.* at 233–34.)  She noted Plaintiff had

been caring for his rash as directed and that it was beginning to resolve on his lower leg, but not

on his upper leg.  (*Id.* at 233.)  The surgery site was clean with no signs of infection.  (*Id.*)  Nurse

Dalpiaz directed Plaintiff to elevate his right lower extremity above the level of his heart several

times each day to combat venous insufficiency.  (*Id.* at 234.)

On July 12, 2003, Plaintiff was admitted to the hospital for a severe heart attack and

immediately underwent heart surgery.  (*Id.* at 208–21.)  During the night, Plaintiff had a gran mal

seizure.  (*Id.* at 208.)  On July 13, 2003, Daniel P. Sullivan, M.D. noted Plaintiff had developed a

pressure ulcer on his medial ankle that Plaintiff had been wrapping with a bandage to control.  (*Id.*

at 212.)  On July 14, 2003, Mitchell Brunbaum, M.D. noted Plaintiff had experienced between six

and ten seizures during the prior year and two to three seizures so far during the present year.

(*Id.*)  The doctor opined that the seizures "should be reasonably well controlled on one of the

major anticonvulsants" and increased the dosage of Plaintiff's anti-seizure medication.  (*Id.* at

208–09.)

On September 10, 2003, a state disability examiner performed a functional capacity

evaluation on Plaintiff.  (*Id.* at 223–30.)  The examiner concluded that Plaintiff's impairments did

not prevent him from: (1) lifting twenty pounds occasionally; (2) lifting ten pounds frequently; (3) standing and/or walking six hours in an eight-hour workday; (4) sitting six hours in an eight-hour workday; and (5) pushing and pulling in an unlimited manner. (*Id.* at 224–25.) Moreover, the examiner found Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (*Id.* at 225–28.) Finally, the examiner noted that Plaintiff did not appear to be a malingerer. (*Id.* at 228.)

On October 26, 2004, Dr. Copeland penned a letter to the Social Security Administration opining that Plaintiff was "quite disabled," and decrying the Administration for failing to act in a timely fashion on Plaintiff's application for disability insurance benefits. (*Id.* at 232.)

On July 18, 2005, Plaintiff had a neurological consultation with Joel M. Dean, D.O. (*Id.* at 238–41.) Dr. Dean reviewed Plaintiff's long history of seizures, noting that higher doses of his seizure medication made Plaintiff "lethargic" and "spacey." (*Id.* at 238.) Plaintiff reported that his last gran mal seizure occurred two years prior when he was in the hospital for heart surgery. (*Id.*) Plaintiff reported having petit mal seizures[3] nearly every day, sometimes seven or eight in one day. (*Id.* at 239.) Dr. Dean noted: "They are brief staring episodes. They may last four or five, eight, or ten seconds. [Plaintiff's mother] says that he seems to stare straight ahead. He may drop something from his hand if he is holding it. He will remain standing upright if he is standing or sitting if he is sitting." (*Id.*) Additionally, Dr. Dean noted Plaintiff had "sustained a number of

---

[3]A petit mal seizure is "a mild seizure or fit, marked by a short lapse of consciousness, dizziness, etc., but without convulsions." 4–P ATTORNEYS' DICTIONARY OF MEDICINE 4445.

injuries from his seizures.  He has lost teeth.  He has fractured a leg.  He has fractured his ankle.

He has had several other injuries." (*Id.*)

Examination revealed Plaintiff had reasonable recall and insight, a modestly developed

vocabulary, and normal language function. (*Id.* at 240.) Dr. Dean found Plaintiff's range of

motion in his cervical spine to be "mildly poor." (*Id.*) The doctor's impression follows:

1.    Long standing history of epilepsy.  This includes probable diagnoses of
      secondarily generalized motor seizures and brief complex partial seizures.
      Currently the complex partial seizures are not at all controlled.
2.    Diabetes with early diabetic neuropathy.
3.    Coronary artery disease.
4.    Limited educational background.

(*Id.*) Dr. Dean expressed surprise that Plaintiff had been unsuccessful in applying for Colorado

state disability benefits considering that "[h]e still has frequent episodes of brief loss of

consciousness." (*Id.*) The doctor concluded: "These partial seizures render [Plaintiff] unable to

drive, unable to climb to heights, unable to use power tools, unable to function in an independent

way.  I think it is clearly the case that he is disabled." (*Id.* at 240–41.) Further, Dr. Dean found

that Plaintiff could not operate equipment, "be left in an unsupervised setting," or work around

open stoves or ovens. (*Id.* at 241.) Dr. Dean indicated that Plaintiff could be evaluated for

epilepsy surgery, but that it was likely his seizures would be "ongoing." (*Id.*) Finally, Dr. Dean

concluded that Plaintiff's seizures "are completely uncontrolled right now and they prevent him

from working." (*Id.*)

On August 4, 2005, Dr. Copeland filled out a medical source statement, stating Plaintiff

had suffered a "major" heart attack and a right ankle fracture, and had venous insufficiency,

chronic low back pain, and a "serious seizure disorder." (*Id.* at 242–45.)  According to Dr.

Copeland, Plaintiff: (1) suffered from impairments that could be expected to last at least twelve

months; (2) was not a malingerer; and (3) did not suffer from a known psychological condition

affecting his physical condition.  (*Id.* at 242–43.)  The doctor described Plaintiff's pain as

"chronic" and found Plaintiff experienced pain "often." (*Id.*)  Due to Plaintiff's "combination of

seizures and cardiac history," Dr. Copeland concluded Plaintiff was incapable of even low stress

jobs.  (*Id.* at 243.)  He found that Plaintiff's ankle fracture was "healed."  (*Id.* at 242.)  Due to

Plaintiff's impairments, Dr. Copeland opined Plaintiff could: (1) walk two to three city blocks

without rest or severe pain; (2) sit four hours in an eight-hour day; (3) stand or walk two hours in

an eight-hour day; (4) frequently lift ten pounds; (5) occasionally lift twenty pounds; (6) reach,

handle, and finger without limitations; and (7) stoop and crouch five percent of an eight-hour

work day.  (*Id.* at 243–45.)  Additionally, the doctor opined Plaintiff could only work in a job that

allowed him to: (1) sit, stand, or walk at will; (2) take unscheduled breaks every one to two

hours; (3) elevate his legs with prolonged sitting; and (4) be absent from work about twice a

month.  (*Id.* at 245.)

**2.      *Medical Evidence Before the Appeals Council***

On December 13, 2005, clinical psychologist Ronald P. Houston, Ph.D. performed a

mental impairment disability evaluation on Plaintiff, which resulted in a twenty page report based

on Plaintiff's medical record, a clinical interview, psychological testing, collateral contact

information, and evaluator observation.  (*Id.*)  Plaintiff reported the following to Dr. Houston.

After failing college in Steamboat Springs, Colorado, Plaintiff returned home to Glenwood

Springs, Colorado, where his two sisters took care of him.  (*Id.* at 21.)  He lived in a group home

there for two years and was employed in a sheltered workshop.  (*Id.*)  Plaintiff's mother informed

Dr. Houston that while in the group home, Plaintiff learned to make a menu and grocery list, as

well as shop.  (*Id.*)  Plaintiff then acquired a government-subsidized studio apartment close to the

workshop.  (*Id.*)  His older sister managed his money.  (*Id.*)  In his late twenties, Plaintiff got a job

at Wendy's, a fast food restaurant, where he "had a fantastic boss" who was "willing to work with

him."  (*Id.*)  After a year, Plaintiff moved to Pueblo, Colorado to attempt to  be independent of his

family.  (*Id.*)  He eventually got a job at a Wendy's there, but was fired after three months for

being too slow.  (*Id.*)  Plaintiff spent most of his time in Pueblo unemployed and living in a

homeless shelter.  (*Id.*)  He then moved to Colorado Springs and lived in a homeless shelter there

for a year.  (*Id.*)  At the time of the evaluation, he was living with his mother in Grand Junction.

(*Id.*)

Plaintiff claimed to have experienced one or two gran mal seizures during the past year.

(*Id.* at 14.)  The only "sign" he associated with the seizures was "feeling very dull mentally," but

his seizure medication also had this side effect.  (*Id.*)  Further:

> [Plaintiff] said that he experience[d] petit mal seizures [five] to [seven] times daily.
> He described one recent event where he suffered a petit mal while exercising and
> injured his groin when he fell off the treadmill.  [Plaintiff] had a similar accident in
> the past when he fractured his right ankle during an episode.  He said that there are
> times when the seizures are more subtle in their manifestation.  [Plaintiff] indicated
> that there are many times he will start and stop in conversation or become slow
> and uncoordinated in his motor movements when he is having momentary seizure
> activity.

(*Id.*)

"Associated impairments reported by [Plaintiff] and his family secondary to his seizure disorder include memory and deficits in executive functions such as planning, organization, and execution of goals in an effective and timely manner." (*Id.* at 16.)  Plaintiff's mother and sister spoke to Dr. Houston "about the dependency that ha[d] evolved from him growing up as a special needs medical child.  He ha[d] also been prone to mood disturbance and anxiety, factors which have been known to aggravate epilepsy." (*Id.*)

Dr. Houston opined that "[Plaintiff's] clinical presentation [was] most consistent with psychological and behavior abnormalities associated with brain dysfunction due to a life long seizure disorder that, according to physicians, is only partially controlled by medications." (*Id.*) After psychological testing, Dr. Houston concluded:

> When considered collectively, [Plaintiff's] structure dependency, deficiency in sequential thinking, and impulsive, impressionistic, uncritical responding demonstrated in [the psychological tests] very much parallels his developmental history dating back to early childhood up through present where he has had to rely on the benefit of teachers and family to regulate his day to day experience and to assist him in behaving in a socially responsible and adult manner.

(*Id.* at 25.)

Dr. Houston diagnosed Plaintiff with an organic mental disorder,[4] personality disorder, and probable degenerative disease of the brain due to his prolonged seizure disorder.  (*Id.* at 30–31.)  Plaintiff's clinical presentation revealed "significant executive dysfunction," with deficits in decisionmaking, judgment, and sequential thinking, "account[ing] for his problems with

---

[4]An organic brain disorder is one caused by an actual change in the structure of the brain. 4–0 ATTORNEYS' DICTIONARY OF MEDICINE 1945.

planning, organization, and the execution of self-directed and socially responsible adult behavior."

(*Id.* at 31.)  Dr. Houston concluded:

> It is clear from the cumulative record, including this evaluation, that [Plaintiff] does have marked restrictions in his ability to perform self-care and daily living activities, largely because of his executive impairments in planning, organization, and carrying out goal directed activities.  Social interactions do not appear to be as impaired with moderate limitations in the accurate appraisal of social cues, comprehension of social sequences, and processes critical to decision making and judgment.  Concentration and pace appear to be relatively intact but [Plaintiff's] ability to persist and carry out tasks to successful completion is markedly impaired.  This would be consistent with the same executive dysfunction that limits his ability to independently manage activities of daily living.  There is no evidence that [Plaintiff] has been vulnerable to repeated episodes of decompensation for an extended duration within the past year.  However, one must consider that he has been living in a structured situation where his mother and sisters have been overseeing his affairs and that regression would be likely in the event that he was living on his own.  This is because he is ill-equipped to deal with the stress of increased mental demands and changes in the environment without the support of others.

> Both the cognitive and personality aspects of [Plaintiff's] mental disorder would place significant limitations on his ability to work effectively and not be distracted by others.  Even with supervision, [Plaintiff's] ability to meet the normal demands of the work place would be hindered by the effects that his organic brain impairment would have on time management, following and carrying out instructions, judgment and decision making, accepting and dealing with criticism, and adapting to changes in the work environment.

> This is not to state that [Plaintiff] is incapable of acquiring skills to compensate for his deficits provided that he has the benefit of ongoing vocational rehabilitative support, structured employment, and a job coach.  If the [c]ourt were to grant disability benefit, [Plaintiff's] case should be reevaluated within the next two to three years.  Reevaluation should focus on his response to rehabilitative services and whether an employer can realistically tolerate and accommodate his disability.

(*Id.* at 32–33.)

Finally, Dr. Houston noted additional testing would be required to determine whether Plaintiff has progressive dementia due to epilepsy, in which case his prognosis would be poor. (*Id.* at 33)

### 3.    *Procedural History*

On May 27, 2003, Plaintiff filed an application for disability insurance benefits.  (*Id.* at 78–80.)  On September 11, 2003, the Social Security Administration denied Plaintiff's application.  (*Id.* at 71–74.)  On September 26, 2003, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 75.)  On August 10, 2005, the ALJ held a hearing, at which Plaintiff, Plaintiff's mother, and a vocational expert ("VE") testified.  (*Id.* at 253–72.)

Plaintiff testified as follows.  His last job was as a bellringer for the Salvation Army in 2002.  (*Id.* at 256.)  He had been generally unable to work because employers fire him due to his inability to "handle" the stress of jobs.  (*Id.* at 256–57.)  He experienced six to seven petite mal seizures each day.  Plaintiff explained:

> [T]hey come and go real fast.  But I really don't know when they are coming.  I could be at the refrigerator getting something and just drop whatever I am holding or picking up, and if someone was talking to me before that I could normally pick up the conversation after the petite mals have gone over.

(*Id.* at 257–58.)  He associated no "symptoms" with these seizures.  (*Id.* at 258.)  He stated: "It's sort of like I am phased, you know."  (*Id.*)

Regarding his right ankle, Plaintiff: (1) experienced swelling when he stood on it for more than four hours, even with regular breaks; (2) could walk three blocks without difficulty; and (3)

-10-

experienced "a bit of pain." (*Id.* at 259.)  Regarding his left leg, Plaintiff experienced "a lot of

pain and swelling in that leg also." (*Id.* at 260.)

Plaintiff took his medications as directed. (*Id.* at 261).  He was able to lift ten to twenty

pounds and sit for four hours. (*Id.* at 262.)  Due to problems with his leg and ankles, he had

difficulties climbing stairs and ladders, bending, crawling, and kneeling. (*Id.*)

As a child, Plaintiff attended special education because he was a slow learner. (*Id.* at

263.)  Although he was able to read a newspaper, reading and writing comprehension was

difficult for him. (*Id.*)  Plaintiff described his daily activities as follows:

> I normally will wake up around [seven] o'clock, and get up and read my Bible and do that
> for around an hour.  I take a shower and then get dressed, and then I pretty much make
> my bed, get my pills, and take my pills.  I eat something with my pills.  So I take care of
> my dirty clothes and put them in the hamper.  I empty the trash.  If there are leaves on the
> patio I vacuum them up.  I will water my mom's plants if it is not raining.  Then I go down
> to my exercise class at the cardio rehab around 1:00 or 1:30 or something like that, and
> come back and normally watch the dogs with my mom until about 4 o'clock.  And I have
> dinner and that's pretty much my day.

(*Id.* at 264.)  Plaintiff lived with his mother, who prepared his meals.  Plaintiff cleaned his own

room, but received help making his bed. (*Id.*)  His hobbies included genealogy, crossword

puzzles, and travel. (*Id.*)

Plaintiff's mother testified that during the seconds in which Plaintiff was having a seizure,

he was "definitely not aware." (*Id.* 268.)  The petite mal seizures sometimes caused Plaintiff to

forget what he was doing or drop what he was holding. (*Id.*)

At the hearing, the VE opined on a series of hypothetical questions posed by the ALJ. (*Id.*

at 269–71.)  The VE testified that an individual of the same age and educational background as

-11-

Plaintiff, who was limited to light work with no unprotected heights, moving machinery, hazardous work areas, climbing ladders or scaffolds, complex tasks, and with a specific vocational preparation ("SVP")[5] of three or less would be able to work as an usher, office helper, or cashier. (*Id.* at 269–70.)  According to the VE, an individual additionally limited to sedentary work would be able to perform work as a telephone answerer, telephone solicitor, and sedentary assembler. (*Id.* at 270–71.)  If such an individual had the additional limitation of being incapable of sustaining attention to tasks on an unpredictable basis for an unpredictable period of time, he  would not be capable of engaging in work.  (*Id.* at 271.)

On September 20, 2005, the ALJ issued a decision reflecting his findings that Plaintiff was not disabled within the meaning of the Social Security Act because Plaintiff retained the capacity to perform work in certain unskilled sedentary occupations.  (*Id.* at 48.)  In reaching this conclusion, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since July 12, 2003.  (*Id.* at 44.)  The ALJ next determined that Plaintiff's seizure disorder and right ankle post-fracture condition constituted medically determinable, severe impairments.  (*Id.*) Despite their severity, the ALJ determined that the impairments were not sufficiently severe to meet or medically equal any of the impairments listed in Title 20 of the Code of Federal Regulations, Part 404, Subpart P, Appendix 1.  (*Id.* at 45.)  Additionally, the ALJ found Plaintiff's

---

[5]SVP is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *Dikeman v. Halter*, 245 F.3d 1182, 1186 n.2 (10th Cir. 2001) (citation and internal quotation marks omitted).

"statements concerning the intensity, duration and limiting effects of [his] symptoms [were] not entirely credible." (*Id.* at 46.)

Based on the evidence presented, the ALJ concluded that Plaintiff had the RFC to:

lift, carry, push, and/or pull no more than ten pounds occasionally; stand and/or walk about two hours in an eight-hour workday; sit about six hours in an eight-hour workday; avoiding all climbing of ladders, ropes, and scaffolds; avoiding all unprotected heights, moving machinery, and hazardous work areas (because of the seizure disorder); and performing no complex tasks (no SVP of [four] or above) (due to effects of medications).

(*Id.* at 45.) In accord with this RFC, the ALJ determined that Plaintiff could perform sedentary work as a telephone answerer, telephone solicitor, and assembly worker. (*Id.* at 48.)

On December 28, 2005, the Appeals Council affirmed the ALJ's decision. (*Id.* at 34.) On February 13, 2006, Plaintiff requested the Appeals Council to reconsider its decision based on Dr. Houston's newly submitted mental impairment disability evaluation. (*Id.* at 11.) On March 6, 2006, the Appeals Council found the new evidence did not give it reason to reopen the ALJ's determination, making it the final administrative decision for the purposes of judicial review. (*Id.* at 9.) On May 11, 2006, Plaintiff filed a complaint in this court challenging the Commissioner's denial of disability benefits. (Compl. [filed May 11, 2006].) On April 16, 2007, Plaintiff filed his opening brief. (Pl.'s Opening Br. in Supp. of Reversal or Remand of Comm'r's Admin. Decision [filed Apr. 16, 2007] [hereinafter "Pl.'s Br."].) On May 26, 2007, the Commissioner filed his response. (Def.'s Resp. Br. [filed May 26, 2007] [hereinafter "Def.'s Resp."].) On June 12, 2007, Plaintiff filed his reply. (Pl.'s Reply Br. [filed June 12, 2007] [hereinafter "Pl.'s Reply"].)

## ANALYSIS

### 1.   *Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of

the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C.A. § 1383(c)(3) (West

2007) (incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in

relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact,
> if supported by substantial evidence, shall be conclusive, and where
> a claim has been denied by the Commissioner of Social Security or
> a decision is rendered under subsection (b) of this section which is
> adverse to an individual who was a party to the hearing before the
> Commissioner of Social Security, because of failure of the claimant
> or such individual to submit proof in conformity with any regulation
> prescribed under subsection (a) of this section, the court shall
> review only the question of conformity with such regulations and
> the validity of such regulations.

*Id.* § 405(g) (West 2007).  Thus, this court's review is limited to determining whether the record

as a whole contains substantial evidence supporting the Commissioner's decision.  *See id.*;

*Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).  The

court must uphold the Commissioner's decision if it is supported by substantial evidence.  *See*

*Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987).  This court cannot reweigh the evidence

nor substitute its judgment for that of the ALJ.  *Jordan v. Heckler*, 835 F.2d 1314, 1316

(10th Cir. 1987).  That does not mean, however, that my review is merely cursory.  To find that

the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant

evidence that a reasonable person might deem adequate to support the ultimate conclusion.  *Frey*

*v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987).  A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it.  *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985).  The ALJ's decision is also subject to reversal for application of the wrong legal standard.  *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

## 2.     *Evaluation of Disability*

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than sixty-five years of age, and is under a "disability."  *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991).  The Social Security Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C.A. § 1382c(a)(3)(A) (West 2007).  In proving disability, a claimant must make a *prima facie* showing that he unable to return to the prior work he has performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).  Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform.  *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability-insurance benefits.  *See* 20 C.F.R. § 404.1520 (2007); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis).  A claimant may be declared disabled

or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded. *See* 20 C.F.R. § 404.1520(a) (2007); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). First, the claimant must demonstrate that he is not currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(b) (2007). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits his physical or mental ability to do basic work activities. *Id.* § 404.1520(c). At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled. *Id.* § 404.1520(d). If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step. At this stage, the claimant must show that the impairment prevents him from performing work he has performed in the past. *See Williams*, 844 F.2d at 751 (citations omitted). If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e) (2007); *Williams*, 844 F.2d at 751. The fifth step requires the Commissioner to demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience; and (2) there is availability of that type of work in the national economy. *See* 20 C.F.R. § 404.1520(f) (2007); *Williams*, 844 F.2d at 751.

**3.      *Disability Determination***

Plaintiff sets forth three arguments in support of his contention that the Commissioner's decision to deny benefits was erroneous: (1) the Commissioner's decision was not supported by substantial evidence; (2) the ALJ erred in assessing Plaintiff's RFC; and (3) the ALJ erred in assessing Plaintiff's credibility. (Pl.'s Br.) I need only address Plaintiff's first argument.

Plaintiff contends that the Commissioner's decision to deny benefits was not supported by substantial evidence, because he failed to properly account for Plaintiff's mental limitations as documented in Dr. Houston's report. (*Id.* at 6–9.) At the center of the Commissioner's decision to deny benefits was the Appeals Council's affirmance of the ALJ's disability determination, in spite of receiving additional evidence — Dr. Houston's report. (*Id.*) Additional evidence is considered by the Appeals Council only if it is (1) new, (2) material, and (3) related to the period on or before the date of the ALJ's decision. *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004). Whether Dr. Houston's report qualifies as new, material, and chronologically relevant is a question of law subject to my *de novo* review. *Id.* at 1139. Evidence is material if there is a reasonable possibility it would have changed the administrative decision. *Id.* at 1144. "If the evidence [is material] and the Appeals Council considered it in connection with the claimant's request for administrative review (regardless of whether review was ultimately denied), it becomes part of the record [this court] asess[es] in evaluating the Commissioner's denial of benefits under the substantial-evidence standard." *Id.* at 1142. Here, both parties agree that the Appeals Council considered Dr. Houston's report; although they dispute whether it is material. (Pl.'s Br. at 7; Def.'s Resp. at 17.)

The Appeals Council found Dr. Houston's report gave it "no reason under [its] rules to reopen and change the [ALJ's] decision." (Admin. R. at 9.) The Council explained:

> The additional evidence submitted consists of an examination performed after the date of the decision. This report includes opinions on issues which are reserved to the Commissioner. In addition, the [ALJ's] decision limited the claimant to unskilled work, and the evidence does not establish any greater work-related limitations than those found in the decision.

(*Id.*)  Plaintiff argues that Dr. Houston's findings regarding executive impairments due to Plaintiff's mental and personality disorders do, indeed, establish greater work-related limitations than those found in the ALJ's decision, rendering the disability determination unsupported by substantial evidence.  (Pl.'s Br. at 7–9.)  The Commissioner cursorily argues to the contrary and states that the Appeals Council need not provide a detailed analysis of its decision.  (Def.'s Resp. at 20.)  Although a more detailed analysis by the Appeals Council of the implications of Dr. Houston's report for the ALJ's decision would have been useful upon review, the Commissioner is correct that no such analysis is required.  *See Martinez v. Barnhart*, 444 F.3d 1201, 1207–08 (10th Cir. 2006) (holding that where the Appeals Council stated that it considered the record, including additional evidence submitted, it need not perform an express analysis of additional material evidence submitted after the ALJ's decision).

Nonetheless, I find Dr. Houston's report is material evidence that renders the Commissioner's decision unsupported by substantial evidence.  Dr. Houston's psychological testing revealed Plaintiff had "significant executive dysfunction" in "planning, organization and carrying out goal directed activities."  (*Id.* at 25, 32–33.)  The doctor further opined:

> [Plaintiff's] ability to persist and carry out tasks to successful completion is markedly impaired. . . .  Even with supervision, [Plaintiff's] ability to meet the normal demands of the work place would be hindered by the effects that his organic brain impairment would have on time management, following and carrying out instructions, judgment and decision making, accepting and dealing with criticism, and adapting to changes in the work environment.

(*Id.* at 32–33.)  It seems obvious to this court that these limitations, standing alone, may be sufficient to change the ALJ's disability determination.  In fact, it seems possible to this court that,

had the ALJ been given an opportunity to consider Dr. Houston's report, he might have

concluded that Plaintiff was disabled at step three.  *See* 20 C.F.R., Part 404, Subpart P, App. 1**,**

Listing 12.02 (2007) (noting required level of severity for organic mental disorders is met, *inter*

*alia*, when claimant experiences change in personality or mood disturbance resulting in marked

restriction of activities of daily living, marked difficulties in maintaining social functioning, or

marked difficulties in maintaining concentration, persistence, or pace).  Regardless, the limitations

noted by Dr. Houston, combined with the effects of the other severe impairments found by the

ALJ, create a reasonable possibility that the ALJ's decision would have been different had he been

apprised of Dr. Houston's report.  Accordingly, the additional evidence at issue is material and,

thus, part of the administrative record considered by this court.  *See Chambers*, 389 F.3d at 1144.

The Appeals Council's failure to give credence to the limitations espoused in Dr.

Houston's report and the ALJ's failure to consider these substantial limitations (although certainly

due to no fault of his own) renders the disability determination unsupported by substantial

evidence.  It is the duty of the ALJ to weigh the functional effect of all Plaintiff's impairments,

singly and in combination.  20 C.F.R. § 404.1545(a), (e) (2007).  The ALJ's failure to consider

Plaintiff's mental impairment infects his disability determination at steps three, four, and five.  At

step three, the ALJ could not consider whether Plaintiff's mental impairments matched or were

equivalent to an established listing.  (*See* Admin. R. at 44.)  At step four, in making the RFC

assessment, the ALJ could not account for the functional effect of Plaintiff's organic brain and

personality disorders.  (*See id.* at 45.)  The only stated limitations that conceivably could speak to

these disorders is that Plaintiff was limited from performing "complex tasks (no SVP of [four] or

above) (due to effects of medications)." (*Id.* at 45.) An SVP of three includes tasks that would require a typical worker one to three months to learn. U.S. DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES, App. C, C–II, (4th Ed., Rev. 1991). This limitation simply does not account for the kind of significant functional limitations Dr. Houston documented; thus the RFC is not supported by substantial evidence. Furthermore, unless discredited, the limitations assessed by Dr. Houston should have been included in the hypotheticals relied upon by the ALJ in determining Plaintiff's ability to work at step five. *See Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991) (internal quotations omitted) ("Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision."). I must, therefore, conclude that the Commissioner's determination that Plaintiff retains the ability to perform the sedentary jobs of telephone answerer, telephone solicitor, and assembly worker is not supported by substantial evidence.

The Commissioner does not attempt to discredit the substance of Dr. Houston's opinion. (*See* Def.'s Br. at 17.) Instead, he makes a rather hazy, and decidedly disingenuous, argument that the doctor's report was not material because it was not relevant to the time period at issue and it included opinions reserved to the Commissioner. (*Id.*) First, although Dr. Houston based his conclusion, in part, on psychological testing a little over four months after the date of the ALJ's decision, he also based the report on Plaintiff's school, work, and life experiences since childhood. (*See* Admin. R. at 13–33.) Dr. Houston's lengthy, detailed report makes clear that it was an assessment of Plaintiff's long-standing developmental problems, rather than an analysis of newly arisen disorders. (*See id.*) For example, Dr. Houston concluded:

> When considered collectively, [Plaintiff's] structure dependency, deficiency in sequential thinking, and impulsive, impressionistic, uncritical responding demonstrated on the [psychological tests] very much parallels his developmental history dating back to early childhood up through present where he has to rely on the benefit of teachers and family to regulate his day to day experience and to assist him in behaving in a socially responsible manner.

(*Id.* at 25.)  Accordingly, I find Dr. Houston's report is chronologically relevant.

Second, it is true, as the Commissioner points out, that a medical source's opinions as to whether a claimant is disabled is not dispositive, because final responsibility for determining the ultimate issue of disability is reserved to the Commissioner.  *Castellano v. Sec'y of Health & Humans Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1992).  However, Dr. Houston was careful never to make a recommendation as to whether Plaintiff was disabled within the meaning of the Social Security Act and expressly recognized that task as the province of the Commissioner.  (*See* Admin. R. at 12, 21–22.)  The Commissioner's insinuation that Dr. Houston's opinion regarding Plaintiff's mental limitations was anything other than a medical one requiring consideration by the ALJ in making his disability determination is simply indefensible.

*4.    Conclusion*

Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is REVERSED and REMANDED for proceedings consistent with this opinion.  On remand, unless the ALJ sufficiently articulates why Dr. Houston's opinion should be rejected, the ALJ should consider the specific limitations caused by Plaintiff's mental impairments at each step in the evaluative process.

Dated this 27th day of September, 2007.

BY THE COURT:


<u>s/ Edward W. Nottingham</u>
EDWARD W. NOTTINGHAM
Chief United States District Judge